UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

JESSICA MORGAN,

                 Plaintiff,

           -against-

MIDDLE COUNTRY CENTRAL SCHOOL DISTRICT,
JAMES DONOVAN, SCOTT GRAVIANO, and KEVIN
RICHMAN, in their individual and official capacities,

                 Defendants.

-------------------------------------------------------------------------X

**COMPLAINT**

**JURY TRIAL DEMANDED**

Case No.: 17-CV-6165

Plaintiff, Jessica Morgan, by her attorneys, The Roth Law Firm, PLLC, complaining of the

Defendants Middle Country Central School District, James Donovan, Scott Graviano, and Kevin

Richman, in their individual and official capacities, sets forth and alleges as follows:

## PRELIMINARY STATEMENT

    1.    This action arises from the acts of sexual discrimination, sexual harassment, and

retaliation by Defendant Middle Country Central School District ("the District"), Defendant

Assistant Superintendent James Donovan ("Donovan"), Defendant Principal Scott Graviano

("Graviano"), and Defendant Assistant Principal Kevin Richman ("Richman") (collectively,

"Defendants") against Plaintiff Jessica Morgan ("Plaintiff"), a tenured, female counselor

employed by the District.

    2.    This case is about a school district and a handful of administrators who collaborated

in stringing together fabricated and unsubstantiated evidence, in many instances consisting of

nothing more than hearsay and innuendo, to level spurious charges against Plaintiff in an attempt

terminate her career. Why? Because Plaintiff had the temerity to report what she believed to be

1

pervasive sexual harassment and discrimination at the hands of her male superiors during and after her pregnancy.

3.    In a bid to discredit her, Plaintiff was forced to undergo a series of psychiatric examinations to demonstrate, in a display of classical sexism, that she was a hysterical and mentally unstable woman. The District also subjected Plaintiff to a series of mandatory drug tests and, in the process, even went so far as to manipulate the testing procedures and lab protocols in order to generate positive results. On or about May 6, 2015, with this "evidence" in hand, among a plethora of other spurious allegations, the District found probable cause to commence a N.Y. Education Law Section 3020-a Proceeding to terminate Plaintiff.

4.    After a protracted and contentious hearing, held over the course of approximately six (6) months, Plaintiff was emphatically and unequivocally cleared of *every charge*. The hearing officer dismissed each and every specification, excoriated the District for its overt failures in presenting any credible or reliable evidence, and directed that Plaintiff be reinstated to her position immediately.

5.    Upon receiving the hearing officer's decision, on or about February 21, 2016, Defendant Donovan scheduled a meeting with Plaintiff to discuss the terms of her reinstatement. The meeting took place on February 25, 2016 and was attended by Plaintiff, Defendant Donovan, Defendant Graviano, and Nadia Resnikoff, President of the Middle County Teacher's Association.

6.    During that meeting, Plaintiff was informed by Defendant Donovan that she would be reinstated. However, what should have been a routine matter of reinstatement was immediately revealed to be a retaliatory means of exiling Plaintiff from Newfield High School. Though reinstated, Plaintiff was also informed that, effective immediately, she would be involuntarily

2

transferred to Selden Middle School – a school where she had never worked in all her years as a guidance counselor.

7.      Evidently dissatisfied with their inability to terminate Plaintiff using appropriate legal channels, the District was resolved to remove her using internal administrative machinations. Even after forcing Plaintiff to endure a transparently baseless witch hunt for over a year, the District was undeterred. Plaintiff's harassers, moreover, were unpunished.

8.      Upon information and belief, neither Defendant Richman nor Graviano were reprimanded or disciplined in any way for their underlying acts of harassment or, for that matter, their focal roles in jointly fabricating disciplinary specifications against Plaintiff as a preemptive, retaliatory strike.

9.      As a result of Defendants' actions, Plaintiff has sustained economic damages, emotional damages, stress, and anxiety.

10.      This action seeks to enforce Plaintiff's rights under applicable state and federal statutes.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction, pursuant to 28 U.S.C. § 1331, over all claims alleged herein arising under 42 U.S.C. § 1983, 20 U.S.C. § 1681, and the Constitution of the United States.

12.      This Court has supplemental jurisdiction to adjudicate all pendent claims pursuant to 28 U.S.C. § 1367(a).

13.      Venue is proper pursuant to 28 U.S.C. 1391(b)(2) because the events and omissions giving rise to the claims alleged herein occurred in this judicial district.

## PARTIES

14.     Plaintiff Jessica Morgan ("Plaintiff") is a school counselor at Dawnwood Middle School, and is a resident of Suffolk County, New York.

15.     Defendant Middle Country Central School District (the "District") is a school district that operates Newfield High School, Selden Middle School, and Dawnwood Middle School. The District's Administrative Offices are located at 8-43rd Street, Centereach, New York 11720.

16.     Defendant James Donovan ("Donovan"), at all times relevant to this action, was and still is the Assistant Superintendent for Human Resources for Middle Country School District and an employee of the District.

17.     Defendant Scott Graviano ("Graviano"), at all times relevant to this action, was and still is the Principal of Newfield High School and an employee of the District.

18.     Defendant Kevin Richman ("Richman"), at all times relevant to this action, was the Assistant Principal of Newfield High School and an employee of Middle Country Central School District. Richman left Newfield on June 30, 2017. Upon information and belief, beginning fall 2017, he will become the Principal of Binghamton High School, which is located at 31 Main Street, Binghamton, New York 13905.

## FACTUAL ALLEGATIONS

19.     Plaintiff, a tenured guidance counselor, has been working for the District since September 2005. Among other duties, her job entails counseling students facing a crisis while at school, mediating student issues, and helping students with their college applications.

20.     From September 2006 until on or about February 2015, Plaintiff also worked as a guidance counselor for the District's Alternative Learning Center ("ALC"), which is an alternative

high school program operated during after-school hours. Every year during this time period, Plaintiff interviewed and was selected for this hourly position, which supplemented her income.

21.     While serving children in these capacities for over a decade, Plaintiff has consistently received "highly satisfactory" performance reviews and is well regarded by her students and their parents.

22.     Upon information and belief, Plaintiff's personnel file contains zero written complaints concerning interpersonal relations from students, parents, colleagues, or supervisors.

23.     Prior to September 2013, Plaintiff enjoyed going to work, for she had spent her entire counseling career working for the same school: Newfield High school ("Newfield").

24.     But in September 2013, Newfield brought in a new Assistant Principal, Richman.

<u>Gratuitously Forcing Plaintiff to Walk while Pregnant</u>

25.     Upon becoming Newfield's Assistant Principal, Richman repeatedly and consistently sexually harassed Plaintiff as set forth herein.

26.     In or about December 2013, Plaintiff was pregnant and suffering from pelvic congestion syndrome. Due to her medical condition, Plaintiff was unable to walk without experiencing pain.

27.     One morning that December, Plaintiff arrived at her office for a counseling appointment with a student. Like many other teachers and members of the staff, Plaintiff had arranged for the main office secretary to sign her in when she arrived. This way, Plaintiff was spared the physical pain and discomfort of walking to the main office herself just to sign her name.

28.     Plaintiff had previously informed Defendant Graviano, that she was experiencing pain in her sciatica and was receiving weekly chiropractic care in order to be able to walk.

Graviano, in turn, informed Plaintiff that he would talk to Defendant Richman about this medical condition and make appropriate accommodations.

29.     Upon information and belief, Defendant Richman knew Plaintiff was pregnant as he was so informed by Defendant Graviano in or about December 2013. Plaintiff, moreover

30.     Upon information and belief, Defendant Richman knew that Plaintiff was experiencing physical complications as a result of her pregnancy and, therefore, unable to walk around the campus without experiencing pain.

31.     Nonetheless, even after being fully apprised of her condition, Richman called Plaintiff's office and instructed her that she was to terminate her counseling session with a student for the sole purpose of walking to the main office and signing in personally

32.     Defendant Richman knew it was common practice for the main office secretary to keep track of staff arrivals. Moreover, Richman knew that it was common practice for the secretary to sign on behalf of staff and faculty to confirm their attendance.

33.     In order to inflict gratuitous pain and embarrassment, Defendant Richman falsely instructed Plaintiff that she had an affirmative obligation to sign in personally and that it was "illegal" for Plaintiff to do otherwise.

34.     Relying on Richman's false representation and fearful of repercussions should she decline, Plaintiff complied with the request to sign in even though doing so caused her great pain and discomfort due to the fact that she had to walk.

35.     Subsequently, Plaintiff spoke to Defendant Graviano, Richman's superior, and inquired whether arranging for the secretary to sign her in was "illegal" or in violation of school policy.

36.     Graviano confirmed that this common practice (asking the main office secretary to sign a teacher in for the day), was perfectly acceptable, and certainly *not* illegal.

37.     Plaintiff reiterated her physical restrictions to Graviano, who then promised to speak with Richman about permitting Plaintiff to continue to sign in through the main office secretary.

38.     Upon information and belief, during this encounter, Graviano stated that Richman has "never had an 8-month pregnant wife before."

39.     As the months passed, Plaintiff continued to fall victim to what she viewed as sexual harassment and discrimination based on sex at the hands of Defendant Richman.

40.     On or about August 2014, right before the school year commenced, Defendant Richman sent an e-mail to Plaintiff asking why she had not asked him for any overrides. As the person in charge of master scheduling, Richman was in charge of using a password that enables classes filled to capacity to be overfilled.

41.     Upon information or belief, an email asking why overrides had not been requested was only sent to Plaintiff.

42.     Feeling singled out, Plaintiff spoke to Defendant Graviano, who promised that he would speak to Defendant Richman about singling out Plaintiff.

43.     One week later, on Monday, September 1, 2014 – Labor Day, when staff does not report to work -- Defendant Richman again emailed Plaintiff demanding an answer as to why she had not responded to his initial email regarding overrides.

44.     At the direction of Defendant Graviano, Plaintiff responded to Defendant Richman's email, indicating that she did not need any overrides.

7

45.     At that point it was abundantly clear that Plaintiff was firmly positioned as a target in Richman's crosshairs.

Purposeful Looming while Plaintiff Pumps Breast Milk

46.     On or about September 2014, Defendant Richman's harassment of Plaintiff continued. Every year, counseling appointments are scheduled for students prior to the first day of school, but it is common for appointments to be scheduled during the first few days of classes and even into the second week.

47.     On or about September 2, 2014, Defendant Richman e-mailed the entire Newfield staff, including Plaintiff, to inform them when they have "café duty" during the 2014-2015 school year. Defendant Richman assigned Plaintiff to café duty during "Period 7" from September 2014 until January 2015.

48.     However, as was common practice through the entirety of her tenure at Newfield, Plaintiff had student appointments scheduled for "Period 7" including the 2014-2015 school year. The purpose of these appointment was to assist as many students as possible in acclimating to their new classes and to ensure that any scheduling issues with students are addressed and promptly resolved before the semester is underway.

49.     At the time that Richman sent his e-mail assigning Plaintiff to café duty, Plaintiff had already been scheduled to meet with a foreign exchange student and her host family during Period 7 the following day, September 3, 2015. This meeting had been scheduled at least two weeks prior during August 2015.

50.     Upon information and belief, due to his control over and responsibilities in scheduling, as well prior practice, Richman knew that Plaintiff was scheduled to meet with a student on September 3, 2014 during Period 7.

8

51. Nonetheless, because of his irrational sex-based animus, Richman deliberately scheduled Plaintiff's café duty to conflict with the student meeting and, in the process, gave Plaintiff less than a day's notice of the abrupt change.

52. Richman knew that Plaintiff could not be at two places at once and that she was not able to adjust her meeting schedules on such short notice. Thus, Richman created a situation wherein Plaintiff would have to choose between abandoning a foreign exchange in need without adequate notice, or failing to report to café duty.

53. This, of course, was exactly what Richman wanted. Richman deliberately orchestrated a scenario under which Plaintiff would fail, one way or another. This failure, in turn, would permit Richman to come into contact with Plaintiff and begin his campaign of targeted discipline and harassment.

54. During the first two weeks of school, it was common practice for counselors to receive coverage for their café duty period in order to complete beginning-of-the-year appointments.

55. On Wednesday, September 3, 2014; Thursday, September 4, 2014; and Friday September 5, 2014, Plaintiff was scheduled with beginning-of-the-year student appointments above and beyond the five periods she was required to work under her collective bargaining agreement.

56. However, as planned, on September 3, 2014, the first day of classes, Defendant Richman stormed over to Plaintiff's office while she was meeting with a foreign exchange student. Richman violently banged on the door and demanded that Plaintiff cut the meeting short and immediately report to café duty.

57.     After this confrontation, Defendant Richman would consistently come to the cafeteria during Period 7—during Plaintiff's assigned café duty time—to confirm that Plaintiff was not still in her office. Richman had exactly what he wanted, a viable pretext to continue stalking and harassing Plaintiff under the guise of ensuring compliance with a scheduling directive.

58.     During this time period, Plaintiff was also nursing her newborn child and was permitted to use her private office to pump breast milk. In order to ensure her privacy, Plaintiff was permitted to place a piece of paper over her office window so that she could not be seen to students or others.

59.     On or about November 2014, Defendant Richman came to the door in the beginning of Period 8, asking why Plaintiff's door was closed with the windows blocked with paper. Richman, as he had in the past, banged on Plaintiff's door but, this time, attempted to catch a glimpse of the inside of the office.

60.     After Richman's intrusion, Plaintiff asked Defendant Graviano to intercede and instruct Richman that the reason why Plaintiff's door is closed for fifteen minutes during the beginning of Period 8 is because she is pumping breast milk for her child.

61.     Plaintiff agreed with Defendant Graviano that she would remove the paper at all times except when pumping breast milk during the beginning of Period 8. Defendant Graviano agreed to continue to let Plaintiff continue pumping breast milk during Period 8 under these circumstances.

62.     After this conversation between Plaintiff and Defendant Graviano, Graviano informed Defendant Richman that Plaintiff was not to be disturbed during Period 8 if her windows were covered. Thereafter, Defendant Richman knew that whenever Plaintiff had her office window

10

blocked with paper and her door closed at the beginning of Period 8 that she would be pumping breast milk.

63. Despite knowing that Plaintiff was pumping breast milk toward the end of the day at a specific designated time, Richman's intrusions continued unabated.

64. Upon information and belief, Defendant Richman on numerous occasions came to Plaintiff's office while her door was closed and window was blocked with paper. Richman persisted in questioning Plaintiff's secretary as to why Plaintiff's windows were covered, despite the fact that he knew Plaintiff was pumping breast milk.

65. In doing so Defendant Richman deliberately spoke loud enough and created a commotion to ensure that Plaintiff knew he was outside her door every time. Richman's intrusions made Plaintiff feel unsafe. Plaintiff believed that Richman would attempt to enter the office in order to humiliate and embarrass her in front of her colleagues and students.

66. Upon information and belief, Defendant Richman would consistently come to check on Plaintiff while she was pumping breast milk through the 2014-2015 semester.

67. Upon information and belief, Defendant Richman purposefully came to check on Plaintiff while she was pumping breast milk, because he knew it made her uncomfortable, and that he was causing Plaintiff to experience sever emotional distress.

Sexual Harassment Complaint & Subsequent Administrative Reassignment Pending Charges

68. On or about December 3, 2014, Defendant Richman sent a directive via email notifying school faculty that a particular student could only attend guidance counselor meetings during their free periods. No explanation was provided for this directive.

69. Subsequently, on or about February 13, 2015, two students, one of whom was directly named by Richman in his e-mail, were escorted by security to Plaintiff's office during

Period 7—their free lunch period. According to Defendant Richman's December 2014 directive, these two students should have been permitted to meet with Plaintiff as their guidance counselor during this time because it was a free period.

73. However, while Plaintiff was talking with the security guard who brought the students to Plaintiff's office, Defendant Graviano came to Plaintiff's office and abruptly removed the students without explanation.

71. A short while later, the two students returned to Plaintiff's office, visibly upset. The students informed Plaintiff that they were told by Defendant Graviano to only seek meeting with Plaintiff when there was something "really wrong."

72. Plaintiff then walked to Defendant Graviano's office to seek clarification on when these students were permitted to seek counseling, noting the inconsistent application of Defendant Richman's December 2014 directive, which would have permitted at least one of the students to meet with Plaintiff because this was their free period.

73. Defendant Graviano yelled at Plaintiff in response.

74. Defendant Richman, who was nearby, walked over to Defendant Graviano's office and laughed at Plaintiff – apparently, in response to Graviano's excoriations.

75. It was at that moment that Plaintiff demanded that a meeting be scheduled to discuss to what she viewed to be Defendant Richman's escalating pattern of sexual harassment. Plaintiff demanded that her union representative be present at the meeting as well.

76. In response to Plaintiff's allegations, Defendant Graviano asked Plaintiff to step into his office, closed his office door and asked Richman to step out so that he and Plaintiff would be alone.

77. Defendant Graviano asked if Plaintiff was serious and whether she truly felt that Richman's actions had spurned her to pursue the filing of a formal complaint for sexual harassment. Plaintiff indicated that she felt she was being targeted by Richman and that she would pursue the filing of a formal complaint upon her return from winter recess, on or about February 23, 2015.

78. On or about February 24, 2015, Defendant Graviano again met with Plaintiff in private and informed her that a meeting will be scheduled, with a union representative, to discuss the "incident" that occurred on February 13, 2015.

79. Plaintiff asked Defendant Graviano whether this meeting would also address Defendant Richman's sexual harassment of Plaintiff.

80. On February 24, 2015, Defendant Graviano agreed that Plaintiff's complaints of sexual harassment would be addressed at a meeting scheduled for February 26, 2015. Defendant Graviano said that the portion of the meeting addressing Defendant Richman's sexual harassment of Plaintiff will be documented in the presence of a union representative.

81. However, the meeting regarding sexual harassment never occurred.

82. Rather, less than 24 hours after securing a commitment from Defendant Graviano that her complaint of sexual harassment would be addressed before a union representative, Defendant Donovan called Plaintiff on February 25, 2015 and informed her that she was being administratively reassigned. Defendant Donovan refused to provide Plaintiff with any further information, and told her only that she would be required to attend a meeting him on February 27, 2015.

83. Despite having no information as to basis for her reassignment, Plaintiff was also immediately removed from her position with the Alternative Learning Center for the remainder of

the 2014-2015 school year. Plaintiff, moreover, was summarily prohibited from applying for the program for the 2015-2016 school year. Plaintiff's union representative confirmed that as long as Plaintiff was administratively reassigned, she could not submit any applications for the ALC or any other programs.

84.     Adding insult to injury, the same day that Plaintiff was removed from the ALC, on or about February 25, 2015, Plaintiff learned that none other than Defendant Richman had been assigned as "co-principal" of the program. The egregiousness of being effectively replaced by her harasser sent Plaintiff into a deep state of emotional distress.

85.     Subsequently, during the February 27, 2015 meeting, Plaintiff administrative reassignment was formally confirmed by Defendant Donovan. Plaintiff was informed that she would remain in that status pending the results of a N.Y. Education Law Section 913 psychiatric evaluation.

86.     Subsequently, on or about April 2015, Defendant Donovan presented Plaintiff with a copy of her psychiatric evaluation and callously informed her that the District commence a Section 3020-a hearing seeking her termination. Specifications were formally filed against Plaintiff on May 6, 2015.

87.     From about February 27, 2015 until June 2015, Plaintiff was directed by Defendant Donovan to report to the special education trailer each day for work.

88.     During this reassignment, Dr. Donna Cooke ("Cooke") was Plaintiff's supervisor.

89.     During this reassignment, Cooke on numerous occasions made comments about Plaintiff's weight.

90.     During this reassignment, Cooke on numerous occasions commented on the quantity of food Plaintiff was consuming during the day.

14

91.     Due to the reassignment, another faculty member was assigned to Plaintiff's old office. When that person would call the special education trailer, Plaintiff's name would appear on the caller ID as if Plaintiff were calling—even though it was no longer Plaintiff's office.

92.     During this reassignment, Cooke's clerical assistant would consistently comment when someone would call from Plaintiff's old office by stating "Oh—Jessica Morgan is calling me! How can that be when she's sitting right in front of me?"

93.     Upon information and belief, Cooke's continued mistreatment of Plaintiff stemmed from Plaintiff's complaints of sexual harassment by Defendant Richman. The harassment continued even over Plaintiff's protestations.

94.     During the Summer of 2015, the District attempted on several occasions to present Plaintiff with a settlement offer, each of which involved, as a condition, Plaintiff stepping down from her position. Plaintiff refused the District's "offers" as she knew these attempts at settlement were nothing more than attempts to buy her silence. Plaintiff knew that she had nothing wrong and was prepared to prove her innocence during the Section 3020-a hearing.

95.     Prior to first day of the 2015-2016 school year, Defendant Donovan informed Plaintiff that her placement was being changed and that she would now have to report to the District Office every day and sit in the lobby.

96.     From September 2015 until November 2015, Donovan directed Plaintiff to work in the lobby reception area of the District Administrative Offices ("DAO").

97.     Upon information and belief, Defendant District has a policy of placing anyone under investigation or facing 3020-a charges on public display in the lobby reception area of the DAO.

15

98. Upon information and belief, this policy is so pervasive that District employees refer to it as "the timeout chair."

99. Upon information and belief, Plaintiff was placed in the "timeout chair" so as to be publicly humiliated among her colleagues, the administration, and anyone else entering the DAO. Evidently, this public humiliation was the price of turning down the District's settlement offers.

100. The person sitting in the "timeout chair" is the first line of contact for anyone entering the DAO, whereas all other staff is firmly behind protective glass and/or locked doors.

101. Plaintiff felt unsafe, humiliated, and depressed sitting in the DAO lobby.

102. On or about November 2015, Plaintiff was again reassigned. Her office changed from the public display of the DAO lobby to the basement of the transportation department.

103. The basement of the transportation department houses science materials and the mail room. It is sparsely staffed. It has a horrid stench. And it has a few small windows, as would be found in a residential basement.

104. Defendants moved Plaintiff from the DAO to the basement in an additional effort to make her working environment miserable during the pendency of the 3020-a hearings.

105. Plaintiff remained in the poorly lit, sparsely staffed, stench-ridden room until she successfully defended herself in the 3020-a proceeding.

<u>The Psychological/Medical Examination</u>

106. On or about February 27, 2015, Plaintiff was informed that she would receive a letter requiring her to undergo an Education Law § 913 exam.

107. The exam took place over a period of two sessions: March 17, 2015 and March 24, 2015.

108. Plaintiff was told via letter that the District directed her to appear for psychiatric examination to determine her capacity to perform her duties as a guidance counselor.

109. Upon information and belief, District supplied Dr. Solomon with an anonymous letter—that did not identify about whom it was written—accusing a mysterious "J." of drug abuse and other serious issues.

110. District's examiner, Dr. Solomon, relied on this anonymous letter in conducting his examination of Plaintiff and producing the accompanying report.

111. During the first day of the exam, March 17, 2015, the psychiatrist performing the exam, Dr. Solomon, asked Plaintiff for access to her prescription records through the New York State Prescription Monitoring Program.

112. Dr. Solomon justified his request by stating that Plaintiff's responses to his questions appeared to be inconsistent.

113. Plaintiff repeatedly denied Dr. Solomon permission to view her prescriptions on the New York State Prescription Monitoring Program.

114. In response, Dr. Solomon replied that her refusal would be reported to the District, implying negative repercussions would ensue. In fact, Dr. Solomon threatened that Plaintiff would be deemed insubordinate and subjected to additional disciplinary proceedings if she refused to permit access to her prescription history.

115. In any event, he further explained at some point during the exam that his examination was not confidential in that a report would be prepared and sent to District personnel.

116. Plaintiff was also advised that information from the examination may be used in disciplinary and/or other administrative proceedings in the future.

17

117.    Plaintiff reluctantly granted Dr. Solomon permission to view her prescription history on the Monitoring Program database based on Dr. Solomon's implication that her refusal to reveal her records will negatively impact the 3020-a process.

118.    Dr. Solomon proceeded to ask Plaintiff detailed questions about her life, prescriptions, and medical history.

119.    During both exam sessions, Dr. Solomon requested permission to conduct a urine-style drug test. Upon information and belief, the first drug test was potentially compromised due to one of the medications Plaintiff was taking for her urinary tract infection at the time. Upon information and belief, the second drug test revealed that Plaintiff was using her prescribed medication.

120.    At the time, Plaintiff believed that her medical history would be handled with care by Dr. Solomon and the District.

121.    Soon after the medical examinations were conducted, Plaintiff began hearing gossip from her co-workers regarding medical information that was revealed to Dr. Solomon during the exam and 3020-a process.

122.    A short time after her Section 913 exam, Plaintiff's co-workers began making false comments implying that Plaintiff abused drugs.

123.    Similarly, Plaintiff's co-workers made false comments implying that Plaintiff had mental health problems and was unfit to continue doing her job.

<u>The District's Unsuccessful 3020-a Proceeding</u>

124.    At a District meeting on May 6, 2015, the Board of Education found probable cause to affirm six charges and nineteen specifications.

125. In the specifications, the District barraged the Plaintiff with a litany of accusations ranging from unexcused lateness to drug abuse and more.

126. The 3020-a charges were frivolous in their entirety.

127. The chain of events leading to the 3020-a procedure began within days after Plaintiff requested a formal meeting to discuss what she believed to be ongoing sexual harassment by Defendant Richman.

128. By decision dated February 21, 2016, Hearing Officer Robert T. Simmelkjaer ("Hearing Officer") ruled in favor of Plaintiff and "directed [the District] to reinstate Ms. Morgan to her position as a guidance counselor at the Newfield High School, effective immediately, with the salary and benefits she is entitled to under the parties' contract." *In the Matter of the Disciplinary Proceeding Preferred Pursuant to Section 3020-a of the Education Law by the Middle Country [sic] Central School District v. Morgan*, File No. 27,019, at 53 (Feb. 21, 2016).

129. The Hearing Officer further found "problematic the District's decision to order the § 913 examination shortly after Morgan indicated her intent to file a harassment complaint against AP Richman." *Id.* at 51.

130. In addition to finding "no basis for discipline in this case," the Hearing Officer noted that Plaintiff has "already suffered a financial penalty and loss of approximately $15,000.00 in wages as a result of her reassignment to administrative duties." *Id.* at 52. Plaintiff has not recovered these lost wages.

<u>Further Retaliation Following Plaintiff's 3020-a Victory</u>

131. Per the Hearing Officer's decision, the District reinstated Plaintiff as a guidance counselor. However, Plaintiff was involuntarily transferred to Selden Middle School, a school that

at which she had never taught. This involuntary transfer directly violated the direction of Hearing Officer Simmelkjaer as Plaintiff was directed to be reinstated *at Newfield High School*.

132.     Subsequently, in May 2016, Plaintiff was informed that for the 2016-2017 school year she would be split between Dawnwood Middle School ("Dawnwood") and Selden Middle School ("Selden").

133.     Upon information and belief, the District employs 20 counselors.

134.     Upon information and belief, Plaintiff is the only counselor that is split between two buildings, even though there are other counselors who are less senior than Plaintiff.

135.     In addition, upon information and belief, Plaintiff is the only counselor at Dawnwood whose office is not attached to the guidance suite where all of the other counselors are located.

136.     For this reason, upon information and belief, while at Dawnwood, Plaintiff did not have the same access to air conditioning, heat, or windows that other counselors in the department have.

137.     These suboptimal and burdensome working condition are clear evidence of the District's continued policy of marginalizing Plaintiff and treating her differently than others.

138.     Upon information and belief, the District treated Plaintiff in this way because she attempted to lodge a formal sexual harassment complaint against Richman, one of the District's administrators.

Title IX Investigation

139.     Upon information and belief, as a result of Plaintiff's repeated attempts to report the sexual harassment she felt from Defendant Richman, a Title IX investigation was conducted by the District beginning in January 2017. In the interim, eight (8) more female members of the

20

Newfield High School faculty came forward with accusations against Richman. One of these women was Ms. Trish Damato, Vice President of the Middle Country Teachers Association ("MCTA").

140.    Upon information and belief, numerous females who interact with Defendants Richman and Graviano complained about sexual harassment to the investigator assigned to the case.

141.    Upon information and belief, the complaints involved both Defendant Richman and Graviano and, critically, were found by the District to have been substantiated. Nonetheless, no remedial action has been taken against either Richman or Graviano.

Damages to Plaintiff

142.    Due to the actions of the Defendants, Plaintiff has suffered monetary, physical, and emotional damages.

143.    Although Plaintiff eventually emerged victorious, the unsubstantiated 3020-a charges and other actions initiated against Plaintiff caused her severe stress and anxiety. Upon information and belief, this stress and anxiety had physical and emotional consequences, which included the necessity of gallbladder removal surgery and swelling in her hands, feet, and joints, which required medical attention, among other things.

**FIRST CAUSE OF ACTION**

42 U.S.C. § 1983 – Equal Protection
(Sex discrimination as against the District, Donovan, Graviano, and Richman)

144.    Plaintiff repeats, reiterates, and re-alleges each and every allegation above as though set forth herein.

145.    Individuals, such as Plaintiff, are protected by the Fourteenth Amendment to be free from gender discrimination in public employment.

21

146. The District, Donovan, Graviano, and Richman are "persons" within the meaning of Section 1983.

147. The District, Donovan, Graviano, and Richman, while acting under color of law, deprived Plaintiff of her Equal Protection rights to be free from discrimination based on gender and/or pregnancy.

148. As a woman, Plaintiff is a member of a protected class.

149. As a tenured counselor with over ten years' experience, Plaintiff was and still is qualified for and capable of performing her job as guidance counselor.

150. Despite performing her job effectively as guidance counselor, Plaintiff was subjected to repeated sex discrimination by the District, Donovan, Graviano, and Richman, which resulted in repeated adverse employment actions as indicated above.

151. Plaintiff was repeatedly subjected to unequal treatment compared to those similarly situated based on sex.

152. The District, Donovan, Graviano, and Richman purposefully, intentionally, and knowingly discriminated against Plaintiff based on sex.

153. As demonstrated by the District, Donovan, Graviano, and Richman's repeated, deliberate actions against Plaintiff, the District maintains a practice, policy, or custom of ignoring complaints of discrimination and taking affirmative actions against those, like Plaintiff, who attempt to exercise their constitutional rights.

154. In taking discriminatory actions against Plaintiff, the District, Donovan, Graviano, and Richman were acting as final policymakers as that phrase is understood under Section 1983 and were aware of and condoned and ratified the disparate treatment mentioned above.

155. The District, Donovan, Graviano, and Richman personally perpetrated these acts of intentional discrimination against Plaintiff with no constitutionally acceptable justification.

156. As a result of the aforementioned actions and policies, Plaintiff has sustained economic, psychological, and emotional damages.

### SECOND CAUSE OF ACTION

42 U.S.C. § 1983 – Equal Protection
(Sexual harassment as against the District, Graviano, and Richman)

157. Plaintiff repeats, reiterates, and re-alleges each and every allegation above as though set forth herein.

158. Individuals, such as Plaintiff, are protected by the Fourteenth Amendment to be free from a hostile working environment in public employment.

159. The District, Graviano, and Richman intentionally discriminated against Plaintiff.

160. The District, Gravino, and Richman while acting under color of law, deprived the Plaintiff of her Equal Protection Rights to be free from a hostile work environment based on gender and pregnancy.

161. The discriminatory actions experienced by Plaintiff were sufficiently extensive to render the working environment hostile to the plaintiff.

162. The discriminatory actions experienced by Plaintiff were so severe and pervasive that a reasonable person would find them hostile and abusive.

163. The Plaintiff was subjected to these discriminatory actions that created a hostile working environment because of the Plaintiff's sex and exercise of her constitutional rights to be free from discrimination while engaged in public employment.

164. As demonstrated by the District, Graviano, and Richman's repeated, deliberate actions against Plaintiff, the District maintains a practice, policy, or custom of ignoring complaints

23

of a hostile environment and taking affirmative actions against those, like Plaintiff, who attempt to exercise their constitutional rights.

165. In taking discriminatory actions against Plaintiff, District, Graviano, and Richman were acting as final policymakers as that phrase is understood under Section 1983 and were aware of and condoned and ratified the hostile environment mentioned above.

166. The District, Graviano, and Richman personally perpetrated these acts of intentional discrimination against Plaintiff with no constitutionally acceptable justification.

167. As a result of the aforementioned actions and policies, Plaintiff has sustained economic, psychological, and emotional damages.

### THIRD CAUSE OF ACTION

42 U.S.C. § 1983 – Equal Protection
(Retaliation as against the District, Donovan, and Graviano)

168. Plaintiff repeats, reiterates, and re-alleges each and every allegation above as though set forth herein.

169. Individuals, such as plaintiff, are protected by the Fourteenth Amendment to be free from retaliation in public employment.

170. The District, Donovan, and Graviano, while acting under color of law, deprived the Plaintiff of her Equal Protection Rights to be free from retaliation in the workplace.

171. Following Plaintiff's attempt to lodge a formal complaint of sexual harassment against Defendant Richman, the District, Donovan, and Graviano took numerous adverse employment actions against Plaintiff in retaliation—initially by attempting to terminate her via the 3020-a proceedings and subsequently by placing her on leave, removing her from the alternative learning center, and splitting her between two middle schools, among other actions taken as described above.

24

172.    The District, Donovan, and Graviano took all of these actions against Plaintiff as a result of her attempt to oppose sex discrimination she was experiencing in the workplace.

173.    Plaintiff's decision to oppose the sex discrimination she was experiencing by attempting to file a formal complaint was a motivating factor and the but-for cause of the adverse employment actions experienced by Plaintiff.

174.    As demonstrated by the District, Donovan, and Graviano's repeated, deliberate actions against Plaintiff, the District maintains a practice, policy, or custom of ignoring complaints of a hostile environment and taking affirmative actions against those, like Plaintiff, who attempt to exercise their constitutional rights.

175.    In taking discriminatory actions against Plaintiff, District, Donovan, and Graviano were acting as final policymakers as that phrase is understood under Section 1983 and were aware of and condoned and ratified the retaliation mentioned above.

176.    The District, Donovan, and Graviano personally perpetrated these acts of intentional discrimination against Plaintiff with no constitutionally acceptable justification.

177.    As a result of the aforementioned actions and policies, Plaintiff has sustained economic, psychological, and emotional damages.

## FOURTH CAUSE OF ACTION

20 U.S.C. § 1681 – Discrimination
(Sex discrimination as against the District)

178.    Plaintiff repeats, reiterates, and re-alleges each and every allegation above as though set forth herein.

179.    Title IX maintains that "[n]o person…shall, on the basis of sex, be…subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

180. Plaintiff is a member of a protected class.

181. As a tenured counselor with over ten years' experience, Plaintiff was and still is qualified for and capable of performing her job as a guidance counselor.

182. Despite performing her job effectively as a guidance counselor, Plaintiff was subjected to repeated sex discrimination by the District, Donovan, Graviano, and Richman, which resulted in repeated adverse employment actions as indicated above.

183. Plaintiff was repeatedly subjected to unequal treatment compared to those similarly situated based on sex.

184. The Plaintiff is a person within the meaning of Title IX.

185. Upon information and belief, the District is an "education program or activity" that receives federal financial assistance.

186. Title IX forbids public education employers who receive federal financial assistance, such as the District, from discriminating against employees, such as Plaintiff, on the basis of their sex.

187. The District was aware of the discriminatory treatment towards Plaintiff and failed to adequately respond by intentionally discriminating against Plaintiff on the basis of her sex.

188. In fact, the District's administrators with authority to take corrective action, including Donovan, Graviano, and Richman, responded to the harassment complaint with deliberate indifference, for the meeting that was scheduled to create a formal record of Richman's harassment of Plaintiff never came to fruition and was instead replaced by the commencement of a 3020-a proceeding against Plaintiff.

189. As a result of the aforementioned actions and policies, Plaintiff has sustained economic, psychological, and emotional damages.

## FIFTH CAUSE OF ACTION

20 U.S.C. § 1681 – Discrimination
(Sex harassment as against the District)

190.    Plaintiff repeats, reiterates, and re-alleges each and every allegation above as though set forth herein.

191.    Title IX maintains that "[n]o person…shall, on the basis of sex, be…subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

192.    Plaintiff is a person within the meaning of Title IX.

193.    Upon information and belief, the District is an "education program or activity" that received federal financial assistance.

194.    Title IX forbids public education employers who receive federal financial assistance, such as District, from permitting the harassment of their employees, such as Plaintiff, on the basis of sex.

195.    The discriminatory actions experienced by Plaintiff were sufficiently extensive to render the working environment hostile to the Plaintiff.

196.    The discriminatory actions experienced by Plaintiff were so severe and pervasive that a reasonable person would find them hostile and abusive.

197.    The Plaintiff was subjected to these discriminatory actions that created a hostile working environment because of the Plaintiff's sex and exercise of her right to be free from being subjected to discrimination under any program or activity receiving Federal financial assistance.

198.    The District's administrators with authority to take corrective action, including Donovan, Graviano, and Richman, responded to the harassment complaint with deliberate indifference, for the meeting that was scheduled to create a formal record of Richman's harassment

27

of Plaintiff never came to fruition and was instead replaced by the commencement of a 3020-a proceeding against Plaintiff.

199.    As a result of the aforementioned actions and policies, Plaintiff has sustained economic, psychological, and emotional damages.

## SIXTH CAUSE OF ACTION

20 U.S.C. § 1681 – Discrimination
(Retaliation as against the District)

200.    Plaintiff repeats, reiterates, and re-alleges each and every allegation above as through set forth herein.

201.    Title IX maintains that "[n]o person...shall, on the basis of sex, be...subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

202.    Plaintiff is a person within the meaning of Title IX.

203.    Upon information and belief, the District is an "education program or activity" that receives federal financial assistance.

204.    Title IX forbids public education employers who receive federal financial assistance, such as the District, from retaliating against their employees, such as Plaintiff, for participating in a protected activity, such as complaining of discriminatory treatment on the basis of their sex.

205.    Following Plaintiff's attempt to lodge a formal complaint of sexual harassment against Defendant Richman, the District, Donovan, and Graviano took numerous adverse employment actions against Plaintiff in retaliation—initially by attempting to terminate her via the 3020-a proceedings and subsequently by placing her on leave, removing her from the alternative

28

learning center, and splitting her between two middle schools, among other actions taken as described above.

206.    The District, Donovan, and Graviano took all of these actions against Plaintiff as a result of her attempt to oppose sex discrimination she was experiencing in the workplace.

207.    Plaintiff's decision to oppose the sex discrimination she was experiencing by attempting to file a formal complaint was motivating factor and/or but-for cause of the adverse employment actions experienced by Plaintiff.

208.    The District's administrators with authority to take corrective action, including Donovan, Graviano, and Richman, responded to the harassment complaint with deliberate indifference, for the meeting that was scheduled to create a formal record of Richman's harassment of Plaintiff never came to fruition and was instead replaced by the commencement of a 3020-a proceeding against Plaintiff.

209.    As a result of the aforementioned actions and policies, Plaintiff has sustained economic, psychological, and emotional damages.

## SEVENTH CAUSE OF ACTION

New York Executive Law § 296 – Hostile Environment
(As against Graviano and Richman)

210.    Plaintiff repeats, reiterates, and re-alleges each and every allegation above as though set forth herein.

211.    The New York State Human Rights Law protects employees, such as Plaintiff, from being subjected to a hostile work environment on the basis of sex.

212.    The discriminatory actions experienced by Plaintiff were sufficiently extensive to render the working environment hostile to the Plaintiff.

213.    The discriminatory actions experienced by Plaintiff were so severe and pervasive that a reasonable person would find them hostile and abusive.

214.    Plaintiff was subjected to these discriminatory actions that created a hostile working environment because of the Plaintiff's sex and exercise of her right to be free from discrimination in the workplace.

215.    The District, Graviano, and Richman were alerted about what the Plaintiff perceived to be sexual harassment yet failed to take any remedial or disciplinary steps in order to ensure a safe working environment free from hostility and harassment on the basis of gender.

216.    Plaintiff was subjected to this hostile working environment because of her gender as the acts of harassment directed at her were part of a retributive campaign by male colleagues.

217.    As a result of the aforementioned actions and policies, Plaintiff has sustained economic, psychological, and emotional damages.

## EIGHTH CAUSE OF ACTION

New York Executive Law § 296(7) –Retaliation
(As against Donovan, Graviano, and Richman)

218.    Plaintiff repeats, reiterates, and re-alleges each and every allegation above as though set forth herein.

219.    The New York State Human Rights Law forbids employers from retaliating against employees, such as Plaintiff, for participating in a protected activity, such as complaining of discriminatory treatment on the basis of their sex.

220.    Following the Plaintiff's attempt to lodge a formal complaint of sexual harassment against Defendant Richman, Donovan and Graviano took numerous adverse employment actions against Plaintiff in retaliation—initially by attempting to terminate her via the 3020-a proceedings

30

and subsequently by placing her on leave, removing her from the alternative learning center, and splitting her between two middle schools, among other actions taken as described above.

221.     Donovan, Graviano, and Richman took all of these actions against Plaintiff as a result of her attempt to oppose sex discrimination she was experiencing in the workplace.

222.     Plaintiff's decision to oppose the sex discrimination she was experiencing by attempting to file a formal complaint was a motivating factor and/or but-for cause of the adverse employment actions experienced by Plaintiff.

223.     To date, Plaintiff continues to be subjected to discriminatory and retaliatory practices.

224.     As a result of the aforementioned actions and policies, Plaintiff has sustained economic, psychological, and emotional damages.

## NINTH CAUSE OF ACTION

42 U.S.C. § 1983 – Right to Privacy
(As against the District)

225.     Plaintiff repeats, reiterates, and re-alleges each and every allegation above as though set forth herein.

226.     The Due Process Clause of the Fourteenth Amendment of the Constitution protects an individual's right to privacy, including the right to confidentiality over medical records that could otherwise result in adverse effects for the individual.

227.     As described above, the District negligently and/or recklessly permitted the dissemination of medical records and information that it had acquired from Plaintiff as to her medical history involving prescription drugs and mental health.

228.    Plaintiff had a constitutional right to privacy over these records as the disclosure of them negatively impacted her employment with the District and her relationship with her coworkers, and the District violated this right in disclosing them.

229.    As a direct and proximate result of Defendants' actions, Plaintiff suffered severe psychological and emotional damages.

### JURY DEMAND

Plaintiff demands a trial by jury upon all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, upon all of the facts and circumstances herein alleged, Plaintiff respectfully requests that this Court:

A.    Grant judgment against Defendants on each and every cause of action alleged herein;

B.    Grant an order awarding Plaintiff damages in an amount to be determined at trial, including, but not limited to, loss of past and future wages, extreme emotional and psychological distress, lost compensation, medical expenses, liquidated damages, punitive damages, as well as any other damages permitted to be recovered by law pursuant to the above causes of action;

C.    Grant an award ordering Plaintiff attorney's fees, costs, and disbursements; and

D.    Grant any such further relief as the Court deems just, proper, and equitable.

Dated: New York, New York
      October 23, 2017

THE ROTH LAW FIRM, PLLC

By:_____/s/_____
Richard A. Roth, Esq.
295 Madison Avenue, 22nd Floor
New York, New York 10017
Tel: (212) 542-8882

*Attorneys for Plaintiff*